UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| CAPITALPLUS CONSTRUCTION SERVICES, LLC, | ) ) ) | |
| | ) | 3:19-CV-00471-DCLC |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | |
| BLUCOR CONTRACTING, INC., | ) ) ) | |
| Defendant. | | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court following a bench trial on March 2-4, 2021. Plaintiff, CapitalPlus Construction Services, LLC, ("CapitalPlus"), sued Defendant, Blucor Contracting, Inc., ("Blucor"), for breach of contract and in the alternative, promissory estoppel. Blucor filed a counterclaim, alleging tortious intentional interference with a business expectancy and tortious inducement to breach a contract. In accordance with Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact and conclusions of law based on the credible evidence presented at trial.

I.  **FINDINGS OF FACT**

Blucor, a corporation based in Mesa, Arizona, serves as a general contractor focusing on general infrastructure contracting such as heavy grading, paving, excavation, water and sewer work. Stodghill & Sons Mining, LLC, ("Stodghill"), a limited liability company based in Pine, Arizona, is in the business of mining, processing, screening, and delivering various sizes of crushed aggregate rock for construction related projects. CapitalPlus, a Delaware limited liability

1

company based in Knoxville, Tennessee, is primarily a receivable based lender/factorer to those in the construction industry.

On May 29, 2018, the Flood Control District of Maricopa County, Arizona hired Blucor as the general contractor for a road construction project in Phoenix, Arizona, designated as Contract FCD 2017C009, Durango Regional Conveyance Channel ("the project") [Ex. 2]. Blucor then subcontracted with Stodghill to deliver the crushed aggregate rock needed for the project and agreed to pay $17.00 per ton for the aggregate delivered to the project [Ex. 4, pg. 2]. On March 18, 2019, Stodghill delivered its first truck load of crushed aggregate.

It soon became apparent that Stodghill could not live up to Blucor's delivery expectations, but it convinced Blucor that its failure was due to a lack of capital. To address its funding issues, it presented its contract with Blucor to CapitalPlus to see if it would purchase the invoice or advance funds on the invoice as collateral. After reviewing the subcontract, CapitalPlus declined to get involved because payment to Stodghill was conditioned, among other things, on Maricopa County paying Blucor.

CapitalPlus explained that for it to provide funding, the account receivable would actually have to be due and payable, not conditioned on Maricopa County paying Blucor or on delivery of the aggregate to the project. Blucor wanted Stodghill to have adequate funding so it agreed to amend its contract with Stodghill. After working through several proposals, on May 1, 2019, Blucor and Stodghill agreed to modify their contract on terms that CapitalPlus found acceptable for it to provide Stodghill with needed funding.

The amendment was significant. Blucor agreed that "upon [its] … visual inspection and written acceptance of said material…" at Stodghill's site, it would be obligated to pay Stodghill "within 90 days upon receipt of a satisfactory invoice for the stored and allocated material." Blucor

2

agreed to be liable to Stodghill for "stored and allocated" aggregate at the mine upon visual inspection and acceptance. Delivery was no longer a prerequisite to liability. They also separated material costs from delivery costs [Ex. 25, pg. 2-3]. Rather than paying $17.00 per ton delivered, Blucor agreed to pay $12.00 per ton of aggregate stored and allocated at the mine and an additional $5.00 per ton for delivery.[1] Dustin Bluth visually inspected the material and executed an "Acceptance Form For Materials Quantity Accepted by Visual Inspection," dating the form April 18, 2019 [Ex. 16]. Bluth represented he had visually inspected the aggregate and that it met the quality specifications for the project. He signed his name underneath the words "Inspected and Accepted by – Blucor…."

On May 6, 2019, CapitalPlus entered into a Master Accounts Receivable Purchase and Security Agreement [Ex. 28] with Stodghill and purchased the Blucor invoice [Ex. 35]. On May 8, 2019, Blucor, Stodghill, and CapitalPlus executed a "General Assignment" in which all parties acknowledged that Stodghill had "granted an assignment of all [its] accounts receivable" to CapitalPlus.[2] [Ex. 34]. Blucor agreed to pay CapitalPlus what it owed Stodghill and agreed not to assert "any claims that it may have against Stodghill … against CapitalPlus.[3] Blucor also executed an "Invoice Verification" form in which it acknowledged CapitalPlus was relying on its representations in "advancing funds" to Stodghill and that "[a]ll requirements for payment on the

---

[1] The total price was $612,252.00 for the material and $256,355.00 for delivery.

[2] The Subcontract between Blucor and Stodghill required that Blucor consent to any assignment of the proceeds under the Subcontract [Ex. 4, ¶ 7].

[3] The specific language of the agreement was as follows:

> Blucor Contracting Inc. is not waiving any claims that it may have against Stodghill & Sons Mining LLC but is merely agreeing not to assert those claims against CapitalPlus. Additionally, there will be no claims, setoffs, or defenses of any nature against funds paid to CapitalPlus.

3

invoice(s) have been completed." Blucor confirmed that the invoice "will be paid by Blucor." Blucor identified the invoice as #4646, dated March 19, 2019, and in the amount of $529,220.62. Upon receipt of these executed documents, CapitalPlus paid Stodghill $423,376.50 (80% of the total invoice amount). Upon Blucor paying the invoice in full, CapitalPlus would withhold its fee for funding the account and return the balance to Stodghill.[4] At least, that was the plan.

For the next 90 days, CapitalPlus stayed out Stodghill's business. Yet, not much changed with Stodghill's performance. Not only did Stodghill not deliver the aggregate as agreed, it was also selling it to others. From Blucor's perspective, this was theft of its material. Stodghill's persistent failures and possible fraud fueled Blucor's increasing frustration in dealing with Stodghill. After 90 days, CapitalPlus expected Blucor to pay the invoice as it had agreed in the amended contract. As one could imagine, given Stodghill's conduct, Blucor declined to pay.

On August 5, 2019, when Blucor had not paid, CapitalPlus demanded payment, giving Blucor until close of business on August 9, 2019 to pay the invoice in full [Ex. 43]. It also advised Blucor it had a security interest in Stodghill's assets, including the aggregate stored and allocated at Stodghill's mine. To ease tension and potentially create a workable solution, CapitalPlus focused its collection efforts on working with both Stodghill and Blucor to get the aggregate delivered to the project. They agreed that going forward Blucor would pay when Stodghill made deliveries. This worked for a time. On two occasions Blucor did not pay CapitalPlus, and in

---

[4] While the parties did not address this, the Court notes the evidence in the trial was inconsistent as to whether this was a factoring arrangement or an invoice discounting arrangement. The Master Agreement between CapitalPlus and Stodghill suggests CapitalPlus would be purchasing the accounts receivable, but Brent Chambers testified that the funding was more akin to a loan with the accounts receivable used as collateral. Indeed, the evidence was that if Blucor would have paid the invoice, CapitalPlus would have deducted its fee for the loan and returned the balance to Stodghill. That payment arrangement is not consistent with an outright purchase of the accounts receivable as suggested by their agreement.

4

response, CapitalPlus directed Stodghill to stop any further deliveries to Blucor. Each of these stoppages lasted approximately one week.

But all the efforts proved for naught. No one could deal with Stodghill. By October 22, 2019, CapitalPlus ended its efforts and sued Stodghill and Blucor in the Knox County Chancery Court for failure to repay the unpaid balance of the invoice. On November 19, 2019, Blucor removed the suit to this court. On November 25, 2019, Blucor terminated its relationship with Stodghill.

## II. CONCLUSIONS OF LAW

### A. CapitalPlus' claims against Blucor

#### 1. Breach of Contract

CapitalPlus' first theory of recovery is the General Assignment and Invoice Verification create a contractual obligation for Blucor to pay CapitalPlus that is separate and independent from its obligation due to Stodghill.[5] Under Tennessee law, a party claiming a breach of contract must prove "(1) the existence of a contract; (2) breach of that contract; and (3) damages [that] flow from that breach." *Life Cares Ctrs. Of Am., Inc. v. Charles Town Assocs. Ltd. P'ship, LPIMC, Inc.*, 79 F.3d 496, 514 (6th Cir. 1996). As a general matter, only parties to a contract can recover damages for breach of that contract. *Owner–Operator Indep. Drivers Ass'n v. Concord EFS, Inc.*, 59

---

[5] The Pretrial Order makes this clear:

> CPC's theories of recovery are: 1) Breach of contract (the contract being Blucor's agreement to pay CPC the value of the invoice it purchased from Stodghill & Sons Mining, LLC as found in the General Assignment and Invoice Verification documents signed by Blucor) for Blucor's failure to pay the value of the SAS invoice to CPC in August 2019….

[Doc. 112].

5

Case 3:19-cv-00471-DCLC-HBG   Document 130   Filed 04/30/21   Page 5 of 16   PageID #: 1737

S.W.3d 63, 68 (Tenn. 2001) ("Traditional privity rules provided that those who were not parties to a contract to a contract had no right to sue for its breach.").

The Court begins with the "General Assignment." As the name suggests, this document gave Blucor notice that Stodghill had assigned its interest in its accounts receivable to CapitalPlus and that Blucor should pay CapitalPlus and not Stodghill going forward. While Blucor was a signatory, the "General Assignment" does not purport to be a specific contract between Blucor and CapitalPlus. It described CapitalPlus' relationship *with Stodghill* but does not impose any contractual obligation on CapitalPlus to do anything for Blucor. CapitalPlus could decline to purchase any of Stodghill's accounts without any fear of breaching any agreement with Blucor.

To be sure, Blucor promised CapitalPlus it would "not to assert … claims against CapitalPlus" that it might have against Stodghill. [Ex. 34]. But this promise lacked consideration. It is true that "[a]ny benefit to one and detriment to the other may be a sufficient consideration." *GuestHouse Int'l, LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 188 (Tenn. Ct. App. 2010) (citations omitted). It is also true that consideration need not be "something concrete and tangible." *Id.* In fact, "[m]utuality of promises is 'ample' consideration for a contract." *Sevier Cty. Sch. Fed. Credit Union v. Branch Banking & Tr. Co.*, 990 F.3d 470, 476 (6th Cir. 2021) (citations omitted). But here there is no mutuality of promises between CapitalPlus and Blucor. As is clear from the General Assignment's terms, CapitalPlus did not promise to fund Stodghill in return for Blucor's promise to waive claims it might have against Stodghill. It just made Blucor aware of the assignment.

The Invoice Verification also did not create an independent contract between Blucor and CapitalPlus. Blucor signed the Invoice Verification for one reason, to acknowledge to CapitalPlus its obligation to pay Stodghill for the aggregate at the mine. "The courts may not make a new

6

contract for parties who have spoken for themselves…." *Marshall v. Jackson & Jones Oils, Inc.*, 20 S.W.3d 678, 682 (Tenn. Ct. App. 1999) (citing *Petty v. Sloan*, 277 S.W.2d 355, 359 (Tenn. 1955)). The parties used the term "verification." CapitalPlus argues that in combination with the General Assignment, the Invoice Verification created a contract. But the Court must give terms "their natural and ordinary meaning." *Id.* at 681 (citing *Evco Corp. v. Ross*, 528 S.W.2d 20, 23 (Tenn. 1975)). Verification means "evidence that establishes or confirms the accuracy or truth of something" or "the process of research, examination, etc., required to prove or establish authenticity or validity." *Verification*, *Random House Unabridged Dictionary* (2d ed.1993). That clearly was the intention of the parties in signing the Invoice Verification form. Blucor did not create an independent contractual obligation to CapitalPlus separate and apart from its obligation to Stodghill by verifying the invoice.[6] Blucor verified it owed Stodghill and acknowledged the assignment. CapitalPlus' claim is derivative and not independent, and the combination of the two forms does not change that.

The Court also notes that CapitalPlus was not an intended third-party beneficiary of the Blucor/Stodghill contract. To be a third-party beneficiary, under Tennessee law, CapitalPlus would have to show (1) a valid contract made upon sufficient consideration between the principal parties, and (2) the clear intent to have the contract operate for the benefit of a third party. *Owner-Operator Indep. Drivers Ass'n Inc. v. Concord EFS Inc.*, 59 S.W.3d 63, 68-69 (Tenn. 2001). The intent of the contract was to have aggregate delivered to the project site. The parties amended the

---

[6] The parties have not argued, and the Court will not find, novation in this case. The party seeking to establish a novation must show "(1) a previously valid obligation, (2) the agreement of all parties to a new contract, (3) the extinguishment of the old contract, and (4) a valid new contract." *TWB Architects, Inc. v. Braxton, LLC*, 578 S.W.3d 879, 891 (Tenn. 2019). Neither party has asserted that the General Assignment and Invoice Verification extinguished the original contract as would be required for novation to apply. *Id.*; *see also Blaylock v. Stephens*, 258 S.W.2d 779, 781 (1953).

7

contract's payment terms but that was not to "benefit" CapitalPlus, but to entice it to fund Stodghill.

Though the parties signed a "General Assignment," CapitalPlus did not seek recovery as the assignee of the account receivable but on the theory of breach of contract between it and Blucor. Tennessee law considers an assignment a transfer of rights, "not a contract (a promise)...." *Collier v. Greenbrier Developers, LLC*, 358 S.W.3d 195, 201 (Tenn. Ct. App. 2009) (quoting E. Allan Farnsworth, *Contracts* § 11.6, pg. 726 (3d ed. 1999)). "[T]he party who brings the suit is master to decide what law he will rely upon." *Loftis v. United Parcel Serv., Inc.,* 342 F.3d 509, 515 (6th Cir.2003) (quoting *The Fair v. Kohler Die & Specialty Co.,* 228 U.S. 22, 25 (1913)). CapitalPlus legal theory sounds in contract, not assignment. Those are different. Having found no merit to CapitalPlus' argument that the General Assignment and Invoice Verification created a contractual obligation directly between it and Blucor separate and apart from the underlying account receivable, the Court will address CapitalPlus' promissory estoppel theory.

### 2. Promissory Estoppel

CapitalPlus' alternative theory is that it is entitled to recovery on the equitable doctrine of promissory estoppel. "Tennessee does not liberally apply the doctrine of promissory estoppel. To the contrary, it limits application of the doctrine to exceptional cases." *Barnes & Robinson Co. v. OneSource Facility Servs., Inc*., 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006) (citations omitted). In Tennessee, a promissory estoppel claim requires a showing that the defendant's conduct "verge[d] on actual fraud." *Shedd v. Gaylord Entm't Co*., 118 S.W.3d 695, 700 (Tenn. Ct. App. 2003). To recover under this theory, CapitalPlus must show "(1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that they reasonably relied

8

upon the promise to their detriment." *Chavez v. Broadway Elec. Service Corp.*, 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007) (citations omitted).

The operative promise here is contained in the Invoice Verification. The Invoice Verification was Blucor's "formal acknowledgment and verification of [Stodghill's] invoices." This verification explicitly advised Blucor that "CapitalPlus will rely on this Invoice Verification in providing services and/or advancing funds to Stodghill…." [Ex. 34]. Blucor also acknowledged that all payments on the invoices "should only be mailed directly to CapitalPlus." [*Id.*]. More importantly, Blucor represented that "[a]ll requirements for payment on the invoice(s) have been completed." [*Id.*]. Dustin Bluth on behalf of Blucor represented and confirmed that "the above statements are true and correct and the invoice(s) listed below will be paid by Blucor Contracting, Inc. to Stodghill & Sons Mining LLC…." [*Id.*]. The invoice was identified as dated March 19, 2019, number 4646, and was in the amount of $529,220.62.

The first two elements of promissory estoppel are easily met. Blucor made a specific representation that the invoice in the amount of $529,220.62 was due and payable and that representation was unambiguous. Blucor signed this verification to keep Stodghill involved in the project. It knew Stodghill needed funding and so it made those representations to CapitalPlus to induce it to fund Stodghill and to assure that Stodghill had the capital to continue working on the project. CapitalPlus, relying on Blucor's representation, funded Stodghill. That is the conduct promissory estoppel was designed to address – conduct that verges on "actual fraud." *Shedd*, 118 S.W.3d at 700. Blucor cannot have its cake and eat it too. It cannot lure CapitalPlus into funding Stodghill with assurances that it will pay in the invoice only to disavow that when the bill comes due.

The final element focuses on CapitalPlus' reasonable reliance on the promise to its detriment. The reasonableness of the reliance "warrants significant consideration in deciding whether enforcement of a promise is necessary to avoid injustice." *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 472 (6th Cir. 2011) (citing Restatement (Second) of Contracts § 90 cmt. b (1981) ("[E]nforcement must be necessary to avoid injustice. Satisfaction of [this] requirement may depend on the reasonableness of the promisee's reliance....")). This element is also easily met. Had Blucor not signed the General Assignment and verified the invoice was due and payable, CapitalPlus would not have advanced any funds to Stodghill. CapitalPlus thus relied to its detriment on Blucor's representations, and Blucor reasonably expected CapitalPlus to rely on its representations in making its decision to fund Stodghill. *See Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn.1982) (promissory estoppel involves "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance") (quoting Restatement of Contracts § 90).

The promise "is binding if injustice can be avoided only by enforcement of the promise." *Id.* (quoting Restatement of Contracts § 90). Such is the case here. CapitalPlus will suffer a substantial loss because it reasonably relied on Blucor's promise. This loss was foreseeable to Blucor as the Invoice Verification could not be more explicit. Finally, CapitalPlus justifiably and reasonably relied on Blucor's representations. After all, Blucor was in the best position to know whether the aggregate at the mine was sufficient for its needs and whether it owed Stodghill the invoice. If that were not so, Blucor should never had represented that to CapitalPlus.

Promissory estoppel applies in this case. Based on Blucor's representations, CapitalPlus advanced funding to Stodghill in the amount of $423,276.50. Since that time, Blucor has paid CapitalPlus a total of $239,120.92 towards that amount [Doc. 112, pg. 12]. That leaves a balance

of $184,155.58. The Court finds that failing to require Blucor to pay this balance would result in an injustice to CapitalPlus.

### 3. Prejudgment interest

CapitalPlus also requests prejudgment interest at 10% for the time since it issued the demand letter. "[T]he purpose of awarding [prejudgment] interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).

> Tennessee courts have identified six factors to aid trial courts in deciding whether prejudgment interest is fair and equitable: (1) promptness in commencing the claim, (2) unreasonable delay of the proceedings, (3) abusive litigation practices, (4) certainty of the existence of an underlying obligation, (5) certainty of the amount due, and (6) previous payment for the lost time value of the money.

*FLSmidth Inc. v. Fiber Innovation Tech., Inc.*, 626 F. App'x 625, 630-31 (6th Cir. 2015). Here, CapitalPlus promptly brought a claim after Stodghill and Blucor stopped performing under the Master Agreement and the assignment. Blucor was obligated to pay under the assignment, and the amount paid to Stodghill, as well as the total payments made by Blucor, are certain and not in dispute. *See Myint*, 970 S.W.2d at 928 ("the more clear the fact that the plaintiff is entitled to compensatory damages, the more clear the fact that the plaintiff is also entitled to prejudgment interest as part of the compensatory damages."). There have been no previous payments for the lost time value of the money. Therefore, the Court finds that prejudgment interest is appropriate in this case.

While Tenn. Code Ann. § 47-14-123 permits a maximum effective rate of 10% per annum, the Court does not find that such a high rate appropriate. Applying a 10% interest rate here "would be a windfall, particularly in the light of the current economic climate." *MAKS, Inc. Gen. Trading & Contracting Co. v. Sterling Operations, Inc.*, No. 3:10-CV-443, 2014 WL 297291, at *2 (E.D.

Tenn. Jan. 27, 2014).  The Court finds 5% is be the appropriate interest rate.  *See also Williams v. Shelby County Bd. of Ed.*, 2020 WL 7061763, at *4 (W.D. Tenn. Dec. 2, 2020); *Bennett v. Highland Graphics*, No. 3:14-cv-02408, 2017 WL 4512470, at *6 (M.D. Tenn. Oct. 10, 2017); *Estate of Fetterman v. King*, 206 S.W.3d 436, 447 (Tenn. Ct. App. 2006). Prejudgment interest does not allow for compound interest awards. *Otis v. Cambridge Mt. Fire Ins. Co.*, 850 S.W.2d 439, 446-47 (Tenn. 1992). Therefore, the Court shall award simple interest here.

Simple interest is equal to the principal multiplied by the interest rate multiplied by amount of time.  In this case, the principal is $184,155.58, the interest rate is .05 per annum, and the amount of time is from August 9, 2019, the date CapitalPlus demanded payment until the date of judgment, or 631 days. That results in prejudgment interest in the amount of $15,918.11.

### B. Blucor's counterclaims against CapitalPlus

#### 1. Blucor's claim that CapitalPlus and Stodghill were partners.

Blucor claims that it is not liable to CapitalPlus because CapitalPlus and Stodghill were partners.  It claims that they represented they were "partners" and that Blucor continued to use Stodghill based on that representation.  These allegations are without merit.

The Court starts with the definition of a partnership.  "In Tennessee, a partnership is the association of two or more persons to carry on as co-owners of a business for profit." *Bowman v. Benouttas*, 519 S.W.3d 586, 600 (Tenn. Ct. App. 2016) (citing Tenn. Code Ann. § 61-1-202(a)). "[T]he existence of a partnership can be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money." *Id.* (quoting *Bass v. Bass*, 814 S.W.2d 38, 41 (Tenn. 1991)).

The relationship between CapitalPlus and Stodghill is evidenced by their "Master Accounts Receivable Purchase and Security Agreement."  [Ex. 28].  That agreement provides that Stodghill

12

"from time to time may offer Accounts" to CapitalPlus for purchase. [Ex. 28, pg. 2]. They did not agree to split profits from their association or "as co-owners of a business." CapitalPlus funded Stodghill and wanted repayment. It was not splitting profits whatsoever.

Neither is a partnership implied from the facts in this case. CapitalPlus and Stodghill did not enter a business relationship for profit by combining their "labor, skill, experience, or money." *Bass*, 814 S.W.2d at 41. The facts only support an arm's length transaction between CapitalPlus and Stodghill. In fact, the credible testimony of Brent Chambers, Vice-President of CapitalPlus, was that it had no input into the management or decisions of Stodghill after CapitalPlus funded the account in May 2019. Its next dealings with Stodghill was not until August when the invoice was due. The Court finds Stodghill and CapitalPlus were not partners as alleged by Blucor.

### 2. Intentional Interference with a Business Relationship and Inducement and Procurement to Breach and Contract.

Blucor argues that CapitalPlus committed a tort when it interfered with its relationship with Stodghill by ordering Stodghill not to deliver material on two occasions, causing a delay in the project. Blucor also argues that Arizona law applies to its tort claims. Tennessee has adopted the "most significant relationship" test of the Restatement (Second) Conflict of Laws for choice-of-law questions for tort claims. *Orlowski v. Bates*, 146 F.Supp.3d 908, 921 (W.D. Tenn. 2015). The state with the most significant relationship is determined by examining: (1) the place of the alleged injury; (2) the place where the injurious conduct occurred; (3) the domicile and/or place of business of the parties involved; and (4) the place where the relationship of the parties is centered. *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 136 (6th Cir. 1996). All these factors favor the application of Arizona law. Arizona is the place of injury and where the alleged injurious conduct occurred. Arizona is also the place of business of both Blucor and Stodghill. These torts do not originate from the General Assignment, which was executed in Tennessee, and there is nothing to

suggest in the General Assignment that the choice of law provision would apply to these torts. In this case, the Court will apply Arizona law to Blucor's claims.[7]

"The elements for tortious interference with business expectancy are (1) the existence of a valid business expectancy, (2) the interferer's knowledge of the relationship or expectancy, (3) the interferer's intentional interference inducing or causing a breach or termination of the expectancy, and (4) resultant damage to the party whose expectancy has been disrupted." *Camelback Plaza W., L.L.C. v. CBRE, INC.*, No. 1 CA-CV 16-0144, 2017 WL 1739114 (Ariz. Ct. App. May 4, 2017). The interference must be both intentional and improper. *Safeway Ins. Co. v. Guerrero*, 106 P.3d 1020, 1026 (Ariz. 2005) (citing Restatement (Second) of Torts § 767 cmt. A (1979)). Similarly, for tortious inducement to breach a contract, any purported interference must have been improper. *Middleton v. Wallichs Music & Ent. Co.*, 536 P.2d 1072 (Ariz. 1975) (internal citations omitted). "If the interference is done in a reasonable and bona fide attempt to protect one's own rights, then the interference is privileged." *D&S Farms v. Producers Cotton Oil Co.*, 492 P.2d 429, 431 (Ariz. Ct. App. 1972).

CapitalPlus directed Stodghill to stop removing aggregate from the mine when Blucor failed to pay for the material removed. CapitalPlus did so "in a reasonable and bona fide attempt to protect" its security interest. *Id*. Stodghill gave CapitalPlus a security interest in all its assets, including all inventory and accounts. CapitalPlus filed its UCC-1 on March 21, 2019 with the Arizona Secretary of State, giving public notice of its interest in Stodghill's assets. Under Arizona law, "[a] security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral." Ariz. Rev. Stat. Ann. § 47-9203(A). A security interest is

---

[7] While Blucor refers to its tort claims as intentional interference with a business relationship and inducement and procurement to breach of contract, Arizona law refers to these torts as tortious interference with business expectancy and tortious inducement to breach a contract, respectively.

14

enforceable when value has been given, the debtor has rights in the collateral and the "debtor has authenticated a security agreement that provides a description of the collateral." Ariz. Rev. Stat. Ann. § 47-9203(B). An authenticated security agreement is a signed agreement that creates a security interest. Ariz. Rev. Stat. Ann. § 47-9102(A)(7)(a) and (A)(73). These requirements are met by the Master Agreement, and therefore, CapitalPlus had a valid security interest in the aggregate.

CapitalPlus notified Stodghill in the chargeback letter that it was exercising its rights under the Master Agreement to take control of the collateral because Stodghill was in default. *See* [Ex. 47]. It directed the rock purchased by Blucor to be held at the mine "and not be transferred, moved or otherwise relocated without prior written consent of Brent Chambers." [Ex. 47]. CapitalPlus also informed Blucor in the demand letter that it may repossess the material, "in which [CapitalPlus] has a first security interest." [Ex. 43].

When the debtor defaults, a secured party may take possession of the collateral or render equipment unusable on the debtor's premises if the physical removal "may be impractical or unduly expensive." Ariz. Rev. Stat. Ann. § 47-9609, Official Comments ¶ 6. After a secured party takes possession or control of the collateral, "the secured party may use or operate the collateral for the purpose of preserving the collateral or its value." Ariz. Rev. Stat. Ann. § 47-9207(B)(4)(a); *see also* § 47-9207, Official Comment ¶ 4. The collateral in this case was tons of rock, stored at the Stodghill mine. Instead of removing the rock from Stodghill's property, CapitalPlus took control of the rock and directed Stodghill to only release the rock at the direction of Brent Chambers. This was its right as a secured party. Its interference in stopping Stodghill from performing under the Subcontract was both privileged and proper given its security interest. Thus, CapitalPlus is not liable under either of Blucor's tort theories.

15

### III. CONCLUSION

For these reasons, the Court finds that CapitalPlus is entitled to a judgment in the amount of $184,155.58 plus prejudgment interest in the amount of $15,918.11 for a total judgment in the amount of $200,073.69 against Blucor. Blucor is not entitled to recover any damages against CapitalPlus and Blucor's counterclaims against CapitalPlus are **DISMISSED WITH PREJUDICE**. A separate judgment shall enter.

SO ORDERED:

s/ Clifton L. Corker
United States District Judge